**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

|  |  |  |
|---|---|---|
| LAWRENCE COUCH and LINDA COUCH, on behalf of themselves and all others similarly situated, | ) ) ) ) | CASE NO._____ |
| Plaintiffs, | ) ) ) | **CLASS ACTION COMPLAINT** |
| vs. | ) ) | **JURY TRIAL DEMANDED** |
| WYNDHAM WORLDWIDE CORPORATION, WYNDHAM DESTINATIONS, INC., WYNDHAM VACATION OWNERSHIP,  INC., and WYNDHAM VACATION RESORTS, INC., | ) ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

## CLASS ACTION COMPLAINT

Come Plaintiffs Lawrence Couch and Linda Couch ("Representative Plaintiffs," "Plaintiffs" or the "Couches"), on behalf of themselves and all others similarly situated ("Class Members"), and for their Class Action Complaint against Defendants WYNDHAM WORLDWIDE CORPORATION, WYNDHAM DESTINATIONS, INC., WYNDHAM VACATION OWNERSHIP, INC. and WYNDHAM VACATION RESORTS, INC., allege the following:

### I.  INTRODUCTION

1.     Defendants are engaged in the multi-billion dollar timeshare industry.  In order to generate income and maximize profits, Defendants engage in a highly organized fraudulent scheme to sell Vacation Ownership Interests ("VOIs") to prospective owners and increase ownership interests of existing owners by utilizing high-pressure sales tactics based on fraud and deception with material omissions, misrepresentations, and concealment.

2.      The Representative Plaintiffs and thousands of other Class Members are the victims of Defendants' unlawful conduct and have paid out millions of dollars to purchase VOIs to stay in resorts owned and operated by Defendants or by Defendants' affiliates and associates, as well as excessive upgrade costs and annual maintenance fees, only to be thwarted in actually staying at one of Defendants' resort of their choosing as they are unable to use the VOI "points" as reasonably expected based on Defendants' representations.  Defendants misrepresent, fail to disclose, and conceal material facts to prospective owners and owners and, as a result, fail to deliver what purchasers reasonably expect in violation of applicable common law, statutory law, and the fraudulently induced contracts.

3.      Defendants' aggressive business model relies on one essential premise:  Defendants make money by *selling* VOIs, not by customers actually *using* the VOIs they have purchased.  In fact, Defendants have a strong incentive to sell as many VOI points as possible, creating further difficulty for owners to stay at properties owned or operated by Defendants or Defendants' associates and affiliates. When owners complain about no access or limited access, Defendants' response is purchase more VOI points to gain access or greater access!  Further, when owners complain about unreasonable and exorbitant maintenance fees, Defendants' response is purchase more VOI points to eliminate or reduce maintenance fees.

4.      In this action, Plaintiffs seek to remedy the injuries, harm and damages they and Class Members have suffered due to Defendants' unlawful and wrongful conduct.

## II.      JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiffs and many Class Members are citizens of states different from Defendants' home state of Florida, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.  Defendants conduct substantial business in this District, have marketed, advertised, and sold timeshare interests in this District, have developed their fraudulent scheme in this District, have implemented their fraudulent scheme in this District and throughout their business operations as alleged herein, have overseen and enforced their fraudulent scheme in and from this District, have benefitted from this fraudulent scheme in this District, and have caused harm to Class Members residing in this District.

7.      Any purported arbitration or forum selection clauses in the purported contracts at issue in this case are invalid and unenforceable.

## III. PARTIES

### A.      Representative Plaintiffs

8.      Representative Plaintiffs, Lawrence Couch and Linda Couch, are residents and citizens of Shawnee, Kansas.

### B.      Defendants

9.    Wyndham Worldwide Corporation is a Delaware Corporation with its principal address in Parsippany, New Jersey.  Wyndham Worldwide Corporation conducts a substantial amount of business in Florida and this District, including the operation of its wholly-owned subsidiaries Wyndham Vacation Ownership, Inc. and Wyndham Vacation Resorts, Inc. prior to June 1, 2018, which have their principal places of business in Orlando, Florida.  Wyndham Worldwide Corporation's registered agent for service in Florida is Corporate Creations Network Inc., 11380 Prosperity Farms Road, #221E, Palm Beach Gardens, Florida  33410.

10.    Prior to June 1, 2018, Wyndham Worldwide Corporation claimed to be one of the world's largest hospitality companies, offering hospitality services through several brands, including but not limited to Wyndham Hotels and Resorts, Ramada, Days Inn, Super 8, Howard Johnson, Wingate by Wyndham, Microtel Inns & Suites by Wyndham, TRYP by Wyndham, Dolce Hotels and Resorts, RCI, Wyndham Vacation Rentals, Wyndham Vacation Resorts, Wyndham Vacation Ownership, Shell Vacations Club and WorldMark by Wyndham.

11.    On June 1, 2018, Wyndham Worldwide Corporation split into two publicly traded companies: Wyndham Destinations, Inc., which focuses on the vacation ownership resorts at issue in this action, and Wyndham Hotels and Resorts, Inc., which focuses on hotels and resorts.

12.    Defendant Wyndham Destinations, Inc. is a Delaware Corporation with its principal address in Parsippany, New Jersey.  Wyndham Destinations, Inc. conducts a substantial amount of business in Florida and this District, including (after June 1, 2018) the operation of its wholly-owned subsidiaries Wyndham Vacation Ownership, Inc. and Wyndham Vacation Resorts, Inc., which have their principal places of business in Orlando, Florida.  Wyndham Destinations, Inc. operates under several brands, including but not limited to Wyndham Vacation Resorts, Wyndham Vacation

Rentals, Wyndham Vacation Ownership, Shell Vacations Club and WorldMark by Wyndham. Wyndham Destination, Inc.'s registered agent for service in Florida is Corporate Creations Network Inc., 11380 Prosperity Farms Road, #221E, Palm Beach Gardens, Florida 33410.

13. Defendant Wyndham Vacation Ownership, Inc. ("WVO") is a Delaware corporation, with its principal place of business in Orlando, Florida. WVO's registered agent for service in Florida is Corporate Creations Network Inc., 11380 Prosperity Farms Road, #221E, Palm Beach Gardens, Florida 33410.

14. Defendant Wyndham Vacation Resorts, Inc. ("WVR") is a Delaware corporation, with its principal place of business in Orlando, Florida. WVR's registered agent for service in Florida is Corporate Creations Network Inc., 11380 Prosperity Farms Road, #221E, Palm Beach Gardens, Florida 33410.

15. Although separate corporations, Defendants engage in uniform and common operations related to vacation ownership.

16. Defendants share the same offices in Parsippany, New Jersey and Orlando, Florida.

17. Defendants share many of the same officers and directors.

18. At all times herein referenced, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a fraudulent scheme and a breach of duty owed to Plaintiffs and Class Members.

19.     At all times herein referenced, Defendants and each of them, were fully informed of the actions of their agents and employees based on Defendants' fraudulent scheme, and thereafter Defendants rewarded those actions and no officer, director or managing agent of Defendants repudiated those actions on behalf of Defendants.

20.     There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

## IV.     HISTORY OF THE TIMESHARE INDUSTRY

21.     The U.S. timeshare industry was founded in the early 1960s during a stagnant economy when hotel and resort developers struggled to sell full ownership condominium properties. Given the difficulty in selling an actual condominium at a resort to a single owner (or husband/wife, for example), developers realized they could "split up" a condominium, selling "ownership shares" to numerous individuals, each of which theoretically gives an owner the right to use the property for certain amounts of time each year.

22.     This simple notion—dividing one condominium or resort property into "ownership shares" and selling it over and over again, to dozens of different buyers—is the fundamental concept that has given rise to the profitable modern timeshare industry. For example, a developer would sell "ownership shares" for a particular condominium on a weekly basis, in other words, 52 weekly

6

ownership interests, the price being determined by the location and the week during the year being purchased as some weeks were more desirable than others.

23.     What timeshare developers learned is that by selling a vacation timeshare unit incrementally, timeshare developers make far more money than if they sold the same unit to one buyer for the market price.  As an illustration, a timeshare developer can build 150 condominiums, each of which might sell for $200,000 on the open market; using a timeshare approach, the developer could sell one-week timeshares in each unit, for a total of 52 "timeshares," for, say, $10,000 each.  By using the timeshare model, the developer's investment brings a return of $520,000—2.6 times greater than the $200,000 it would have grossed selling to one buyer.

24.     Typically, a vacation ownership purchaser acquires either a fee simple interest in a property, which gives the purchaser title to a fraction of a unit, or a right to use a property, which gives the purchaser the right to use a property for a specific period of time.  Generally, a vacation ownership purchaser's fee simple interest in or right to use a property is referred to as a "vacation ownership interest."

25.     The timeshare business has been booming for years.  In 2015, approximately 9.2 million American households owned timeshares.  There were 1,547 timeshare resorts in the United States, with approximately 200,720 units available to be divided up and sold repeatedly.  The timeshare industry sold $8.6 billion worth of timeshares to consumers in 2015, with an average sales price of $22,240 and average maintenance fees of $920.  *See* Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, available at http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howard-nusbaum.pdf; *see also* Gretchen Morgenson, "The Timeshare Hard Sale Comes Roaring Back," New

York Times, January 22, 2016, available at https://www.nytimes.com/2016/01/24/business/diamond-resorts-accused-of-using-hard-sell-to-push-time-shares.html.

26.     The industry is currently experiencing a period of substantial growth. Timeshare sales volume has increased by more than 33% since 2011, the industry reports, an average of 7% annually. In the most recent year for which data is available, sales volume rose from $8.6 billion in 2015 to $9.2 billion in 2016, a nearly 7% increase. This is part of a seven-year growth trend: in 2015, sales volume increased by nearly 9%, the second-largest percentage increase since the housing market collapse of 2008 caused the Great Recession. *See* American Resort Development Association data at http://www.arda.org/arda/aif-foundation/default.aspx?id=5589&libID=5608.

27.     The timeshare industry's record profits are driven by sales of ownership shares. In fact, a timeshare business makes money every time someone makes a down payment or monthly payment on a timeshare, including paying steep annual "maintenance fees," but when owners actually *use* the properties, it prevents the timeshare developer from renting that property to another customer or using it to entice a prospective owner to buy a timeshare. Selling ownership interests to new owners and selling *more* ownership interests to existing owners is the lifeblood of the timeshare industry. Simply put, without making more and more sales each year, the timeshare industry would not be as profitable.

28.     For years, the timeshare industry has been a breeding ground for fraudulent sales schemes like those employed by Defendants as detailed herein. Since its founding in the 1960's, the industry has relied on "sneaky come-ons" to trap consumers in "multihour presentations complete with high-pressure sales tactics." *See* Consumer Reports, "The Timeshare Comes of Age," Feb. 23, 2016, available at http://www.consumerreports.org/travel/the-timeshare-comes-of-age/. In recent

years, lawsuits and news reports have documented "high pressure sales tactics involving deliberate lies and misrepresentations to get people to buy more timeshare 'points.'" New York Times, "My Soul Feels Taller: A Whistleblower's $20 Million Vindication," https://www.nytimes.com/2016/11/25/business/my-soul-feels-taller-a-whistle-blowers-20-million-vindication.html.  Among the tactics used by Defendants under their fraudulent "TAFT scheme are "TAFT" days, where Defendants' employees were encouraged to "Tell Them Any F---ing Thing" to make a sale, as long as they didn't put it in writing.  *Id.*  "TAFT," as described in detail below, is used to refer more generally to Defendants' fraudulent scheme.

29.    In addition, the timeshare industry relies on owners' inability to resell their timeshare interests, despite telling prospective owners that they are purchasing an asset that will only appreciate in value.  Across the industry, timeshare companies refuse to buy back timeshare interests from customers who no longer wish to own them.  As Diamond Resorts, a major industry player, noted in an annual financial filing, if the resale market "were to become more organized and liquid," the resulting availability of vacation units "could adversely affect our sales and our sales prices." Gretchen Morgenson, "The Timeshare Hard Sale Comes Roaring Back," New York Times, January 22, 2016, available at https://www.nytimes.com/2016/01/24/business/diamond-resorts-accused-of-using-hard-sell-to-push-time-shares.html.  Not only are some timeshare businesses known for fraudulent sales tactics, once they convince owners to purchase a timeshare interest, they trap them in a valueless resale market, leaving them with few options but to continue making their monthly mortgage and maintenance fee payments without recourse.

30.    The timeshare industry also profits from the significant "maintenance fees" charged to each owner.  These fees are supposed to pay for property taxes, landscaping, management, and

insurance, and must be paid by the owner *ad infinitum* even after the full purchase payment is satisfied. Consumer Reports, "The Timeshare Comes of Age," Feb. 23, 2016, available at http://www.consumerreports.org/travel/the-timeshare-comes-of-age/. To the timeshare industry, these maintenance fees are not designed to cover things such as property taxes, property maintenance, management and insurance; but are instead a separate profit center designed to increase revenue. Indeed, the leading vacation timeshare trade group celebrates that maintenance fees have increased 4% percent per year on average since 2010. In 2015, the average timeshare owner paid $920 in maintenance fees per property. *See* Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, available at http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howard-nusbaum.pdf; *see also* American Resort Development Association, "A Look At Timeshare" Infographic, http://vacationbetter.org/wp-content/uploads/2015/07/aif_15SOIInfographic_7.14.15.jpg

31.     The greed and profit motive behind the timeshare industry has not gone unnoticed. In recent years, regulators in jurisdictions across the United States have begun enforcing consumer protection laws against the timeshare industry. For example, Tennessee Attorney General Herbert H. Slatery III announced a $3 million settlement with timeshare company Festiva due to fraudulent and deceptive tactics that violated the Tennessee Consumer Protection Act. *See* https://www.tn.gov/attorneygeneral/news/2016/2/24/pr16-04.html. In New York, Attorney General Eric Schneiderman halted sales at the Manhattan Club due to allegedly fraudulent sales practices, citing "high pressure sales tactics" and a "bait-and-switch timeshare scheme," https://ag.ny.gov/press-release/ag-schneiderman-announces-court-order-barringsales-manhattan-

club-timeshare-hotel. Diamond Resorts International has been sued by owners' groups at multiple

resorts, including Diamond Monarch, Hawaii at Poipu, and ILX, alleging fraud and intimidation.

*See* Courthouse News Service, "Timeshare Giant Wants Class Action Dumped," January 7, 2016,

available at https://www.courthousenews.com/timeshare-giant-wants-class-action-dumped/;

Timesharing Today, "Diamond Resorts Hit With Lawsuit by Poipu Point Owners," May/June 2012,

available at http://www.tstoday.com/members/magazine/issue123/7-poipu%20point.pdf; and

Courthouse News Service, "Couple Claim Timeshare Group Rolled Them," March 12, 2015,

available at https://www.courthousenews.com/couple-claim-timeshare-grouprolled-them/.

## V.    DEFENDANTS' HISTORY

32.    Defendants' timeshare operations trace back to the late 1960s as Fairfield Resorts,

one of the nation's first timeshare developers. In the 1980's Fairfield Resorts decided to diversify

from its core timeshare product into such areas as real estate, housing developments, commercial

sites and golf courses. Financial struggles set in, however, forcing Fairfield Resorts to file for

Chapter 11 bankruptcy in 1990, emerging in 1992 with a new model as the first timeshare operator

to transition from the original, fixed-week ownership structure discussed in Paragraphs 21-24 of this

Complaint, to a "points-based" system which is widely used in the industry today.

33.    Fairfield grew throughout the remainder of the 1990s, with the corporate headquarters

moving from Little Rock, Arkansas to Orlando, Florida in 1999. In 2001, Fairfield was bought by

real estate and hospitality company Cendant for a reported $690 million, naming Franz Hanning[1] as

CEO. The next year, Cendant also bought Trendwest Resorts and Equivest Finance, creating the

---

1 Franz Hanning began working in the timeshare industry in the 1970s at Fairfield Resorts moving up the ranks until he
became CEO of Wyndham Vacation Ownership.

11

Cendant Timeshare Resort Group which was, at the time, the largest vacation ownership company in the industry.

34.     Meanwhile in 2004, Wyndham International, in conjunction with timeshare operator Tempus Resorts International, announced the launch of the brand Wyndham Vacation Ownership, which was originally created to attract independent timeshare and hotel developers to participate in a franchise and affiliation arrangement under the Wyndham brand. Wyndham International was then sold to affiliates of the Blackstone Group in June 2005, which then sold the Wyndham brands to Cendant. In October 2005, Cendant separated through spin-offs into four separate companies, including a spin-off of its hospitality services businesses to be re-named Wyndham Worldwide Corporation. During July 2006, Cendant transferred to its subsidiary, Wyndham Worldwide Corporation, all of the assets and liabilities of Cendant's Hospitality Services businesses and on July 31, 2006, Cendant distributed all of the shares of Wyndham Worldwide common stock to the holders of Cendant common stock issued and outstanding on July 21, 2006, the record date for the distribution. The separation was effective on July 31, 2006. Franz Hanning, referenced in Paragraph 33 of this Complaint, was the CEO of Wyndham Vacation Ownership until late 2016 when he stepped aside shortly after a jury awarded a $20 million dollar verdict to Patricia Williams, a former Wyndham Sales Representative who alleged that she was wrongfully terminated after protesting Wyndham's fraudulent and deceptive trade practices in the sale of timeshares. As the CEO of Wyndham Vacation Ownership, Hanning was instrumental in developing the marketing and sales strategies of Wyndham's timeshares, including the fraudulent and deceptive policies and practices alleged in this Complaint.

35.     As of 2017, Wyndham Vacation Ownership, a brand of Wyndham Worldwide Corporation at the time, was the world's largest timeshare business based on the number of resorts, units, owners and revenues, with 221 resorts and over 878,000 owners.  According to Wyndham Worldwide Corporation's 2017 10-K, Wyndham develops and markets VOIs to individual consumers, provides consumer financing in connection with the sale of VOIs and provides property management services at resorts.

## VI.    DEFENDANTS' BUSINESS OPERATIONS

### A.    The "Points" Concept

36.     As discussed above, the timeshare industry is driven by the sale of Vacation Ownership Interests ("VOIs"), which are represented by "points."  Put simply, a purchaser enters into a contract to pay a certain amount of money to purchase a certain number of points which can be used each year to stay at one or more of the resorts either owned or operated by the timeshare company or a resort of one of its affiliates.

37.     Thus, in order to stay at a resort owned or operated by a timeshare company, or a resort affiliated with a timeshare company, an owner must use his or her points to stay at a resort unit.  The amount of points necessary to stay at a particular resort unit is based on several factors, including the location of the property and the date(s).

38.     Defendants operate in a similar manner as discussed in Paragraph 36 of the Complaint.  For example, according to the 2014-2015 Wyndham Members Directory, excerpts which are attached as **Exhibit 1** to this Complaint, in theory one could stay a week in a two-bedroom Deluxe Unit at the Wyndham Bonnet Creek Resort in Lake Buena Vista, Florida during weeks 23-33 of the year in "Prime Season" for 224,000 points, but for only 112,000 points during weeks 43-50 of

13

the year in "Value Season." By contrast, in theory, one could stay for a week in a two-bedroom unit at Wyndham Lake of the Ozarks in Missouri during weeks 21-36 of the year in "Prime Season" for 164,000 points, but only 98,400 points during weeks 49-50 during "Value Season." *See* **Exhibit 1**.

39.     Owners can stay at a resort for less than a week, which is also assigned point values. For example, owners can stay at a resort for two nights (Friday-Saturday), three days or four days for a certain number of points depending on the Season (Prime, High, Value). *See* **Exhibit 1**.

### B.     TAFT: Defendants' Fraudulent Scheme

40.     Defendants have developed, implemented, overseen, and enforced a fraudulent sales scheme often referred to as "TAFT," which stands for "Tell Them Any F---ing Thing." As part of "TAFT," Defendants have developed a series of methods for their sales representatives and other employees to utilize in order to lure prospective owners or existing owners into their sales office for a "tour," a "problem," an "account review" or an "owner update." These methods are fraught with fraudulent and deceptive statements regarding the purpose of the visit to the sales office, the nature of the presentation, and the length of time that a prospective owner or existing owner will spend in the office.

41.     Defendants have also developed and implemented a series of sales pitches in accordance with "TAFT," which are fraught with fraudulent and deceptive statements, as well as material omissions and concealment. Defendants train and instruct their sales representatives on "wordsmanship," which is simply code to phrase things in a misleading fashion so as to dupe an individual or couple to purchase VOIs. In short, Defendants instruct, train and encourage sales representatives to lie to customers in the context of high-pressure sales pitches.

14

42.    Defendants have also developed, implemented, overseen, and enforced a common method by which to train their sales representatives on Defendants' fraudulent sales scheme. Defendants' sales representatives go through constant fraudulent sales scheme training by management and more senior sales representatives.   At Defendants' sales office, sales representatives are required to attend monthly morning meetings where they are instructed on how to use "wordsmanship," as well as other various methods to mislead prospective owners and existing owners into making a purchase.

43.    Following the mandatory morning meetings, sales representatives regularly attend smaller follow-up meetings conducted by their managers, who provide further instruction and training on the use of Defendants' fraudulent sales scheme.

44.    In addition, Defendants have developed, implemented, overseen, and enforced a "team" concept, by which more seasoned sales representatives, who are well-trained in "TAFT," mentor, coach and instruct less seasoned sales representatives through on the job "TAFT" training.

45.    Defendants utilize a uniform and common sales strategy at their resorts in the United States and United States Territories, including the use of Front Line Sales Representatives for prospective new owners and In-House Sales Representatives for existing owners.

46.    Defendants' uniform and common sales strategy also includes Discovery Sales Representatives for individuals or couples that Defendants could not initially convince to make a purchase of a VOI and are offered a "trial package," which is essentially like a rental with the option to purchase within a specified period of time.

47.     Defendants also utilize a uniform and common organizational structure for their sales forces at their vacation resort properties, consisting of sales representatives, managers, site directors, and site vice presidents.

48.     Defendants also employ area vice presidents, who are responsible for overseeing multiple vacation resort properties, as well as regional vice presidents, who are responsible for overseeing certain geographic regions of the country.

49.     At the corporate level, regional vice presidents report to officers or VPs, such as the Chief Sales & Marketing Office, who report directly to the CEO.

## C.     TAFT:  Luring Prospective Owners

50.     In an effort to obtain new owners, Defendants market their timeshare ownership program utilizing various marketing tools.

51.     Defendants operate a large marketing department which contacts prospective owners by telephone, mail and internet offering various promotions, such as "free" or "reduced" stays at one of Defendants' resort properties or an affiliated or associated property,[2] prepaid VISA cards, or vouchers for free meals or free tickets to local attractions.  In exchange, the recipient agrees to attend a 60-90 minute "presentation" or "tour."

52.     Defendants employ marketers who roam areas where vacationers are located, work out of kiosks in or near vacation attractions, hotels or local shopping areas.  Commonly referred to by Defendants' employees as "body snatchers," these marketers use some or all of the same marketing tools outlined above in Paragraph 51 to lure prospective owners to attend a 60-90 minute "presentation" or "tour."

---

2  Defendants often misrepresent that the "free" or "reduced" stay is at one of Defendants' properties, when in actuality

53.     The "presentation" or "tour," is assigned to one or more of Defendants' sales representatives.  While the prospective owners agreed to attend a 60-90 minute "presentation" or "tour" in exchange for the promotional item, once they arrive at the Defendants' sales office at the resort, Defendants' agents subject them to a high-pressure sales pitch replete with lies, omissions, and concealment, which, instead of lasting 60-90 minutes, ends up being hours and hours (in some instances as long as eight hours).  Defendants' "presentations" and "tours" are designed to, and Defendants' sales representatives are trained and provided instructions and fraudulent sales tactics designed to, increase the likelihood of making a sale to the prospective owner.  Defendants' sales representatives attempt to persuade prospective owners by telling them that a timeshare is cheaper than paying for future vacations, and create a false sense of urgency by stating that that they must act immediately in order to take advantage of supposedly discounted prices.  Defendants' sales representatives are trained to fight a war of attrition, wearing down prospective owners into submission.  In many instances, the prospective owners are deprived of food or drink for hours on end, awaiting the end of the "presentation" or "tour" to claim their "gift."

54.     As part of the "presentations" or "tours," Defendants also misrepresent how their points system works by not telling prospective owners that units at Defendants' resorts are *subject to availability* and because Defendants have sold VOIs with millions of corresponding points, those who become new owners are not able to stay *where* they want *when* they want because the property is completely booked.  But Defendants have a self-serving solution for these new owners and other owners for that matter – increase one's ownership interest to give the owner *priority* over other

---

the "free" or "reduced" stay is at a much less expensive resort not owned or operated by Defendants.

owners to book at a particular location or over other owners to book at all locations in Defendants' inventory of properties which are owned or operated by Defendants or their affiliates or associates.

### C.      TAFT:  Existing Owners

55.      In an effort to get existing owners to increase their VOIs (*i.e.* purchase more points), Defendants utilize various marketing tools which are commonly and uniformly used at each of Defendants' resorts where sales offices are located.

56.      Defendants regularly market existing owners with invitations to special dinners or weekends, which are designed to get the owners to the property and into the sales office.

57.      When owners check in, they are immediately contacted by an individual who asks when he can deliver the owners' welcome gift.  In actuality, the "gift" is simply a ruse used to gain entry into the unit occupied by the owners so that a sales representative can utilize standardized and uniform fraudulent sales pitches to convince owners that they need to visit the sales office because a "problem" has been noted in their account and that they need to come to the office for an "account review."   There is no real "problem" with the account, however, something is identified by Defendants that, according to Defendants, can be "corrected" with the purchase of additional points.

58.      Defendants have developed, implemented, overseen, and enforced a program where owners on site are told that they need to attend an "update" meeting regarding new "deals," "plans" or "benefits" being offered to existing owners.  Defendants use new "deals," "plans," "programs" or "benefits" as a tool to get the owners to the sales office where they are subjected to high-pressure

meetings with sales representatives who pitch the increase of their timeshare ownership interest through the purchase of additional points based on lies, omissions, and concealment. When necessary, another sales representative or manager comes over to "work the table" in a tag-team effort to pressure owners into a purchase.

59.     Existing owners arrive at the sales office where they are subjected to high-pressure fraudulent sales pitches by Defendants' sales representatives who are trained to fight a war of attrition, wearing down owners into submission. Although told that they are attending a short meeting to address a "problem" that needs an "account review," an owner "update" meeting, or an "account review" meeting to discuss a new "deals," "plans", "programs" or "benefits," existing owners ends up being in the sales office for hours and hours (in some instances as long as eight hours).

60.     Defendants' sales representatives are trained and provided instructions and fraudulent sales tactics designed to increase the likelihood of making a sale to the owner. In many instances, the owners are deprived of food or drink for hours on end.

### D.     TAFT Methods Used on Prospective and Existing Owners

61.     To effectuate Defendants' fraudulent scheme detailed herein, Defendants fail to disclose, omit, and conceal material and legally required information from prospective owners and existing owners.

62.     Defendants' sales agents pressure purchasers to sign a series of complex and misleading legal documents; only months later, when the new timeshare owners attempt to reserve vacation time in "their" unit, do they learn that Defendants sold them something entirely different than what Defendants told them they had purchased.

63.     Defendants represent to prospective purchasers that as timeshare owners, they will have no difficulty using their timeshare unit whenever they want.  In reality, Defendants fail to disclose and conceal that timeshare owners are routinely unable to book units at one of the resorts owned or operated by Defendants, or resorts associated or affiliated with Defendants, even with as much as 12 months' notice.  Timeshare owners have made repeated attempts to book a stay, only to be told by Defendants' representatives that there is no availability at the resort of their choosing.  As a result many Class Members have been entirely unable to use their timeshare property for an entire year or forced to stay at another less desirable resort in order to utilize their allotted points for the year.

64.     Defendants specifically fail to disclose to purchasers that tens of thousands of people own VOIs having priority over them making it impossible or virtually impossible to stay at the resort of their choosing at the time they want to go.  Once this is discovered by Class Members, Defendants' response is that in order to obtain priority to stay at the resort of your own choosing when you want to stay, you have to buy more VOIs.

65.     Likewise, Defendants fail to disclose to purchasers that they set aside a substantial number of units at their resorts as vacation rentals, further restricting the supply of units available for timeshare owners to use.  In other words, Defendants choose to rent units out—including the specific units they list in deeds of sale to timeshare owners—instead of making them available to owners.

66.     Defendants are incentivized to rent units at their resorts to non-owners, providing further opportunities to market to these individuals while they are staying on the property using

Defendants' uniform and standardized fraudulent sales scheme described above, thereby increasing the number of new owners each year.

67.    In some instances, Defendants have told timeshare owners that there is no availability in the unit type listed on their deeds, but the owners then find the same unit type listed on Defendants' website as a vacation rental, with proceeds going to Defendants.

68.    In addition, Defendants do not inform purchasers that they set aside large numbers of demonstration units for tours and sales efforts they use to generate new timeshare business. Because Defendants' unquenchable thirst for more and more profits depends on sales to new owners, Defendants devote substantial resources to high-pressure fraudulent sales "presentations" and "tours," during which dozens to hundreds of prospective purchasers are brought each day through many of the nicest timeshare units at the resorts. None of these units are available to the owners who have legitimately paid for the right for access to them.

69.    Defendants, in carrying out "TAFT," engage in the following actions or inactions: a) make false or misleading statements in the advertisement and sale of VOIs to Plaintiffs and Class Members; b) omit and conceal material facts in the advertisement and sale of VOIs to Plaintiffs and Class Members; c) employ a scheme or artifice to defraud Plaintiffs and Class Members; d) fail to exercise good faith in dealing with Plaintiffs and Class Members; e) create a false impression regarding Defendants' current vacation ownership plan or future plans with Plaintiffs and Class Members; f) fail to provide full and fair disclosures of information regarding the purchase of VOIs and the purchaser's rights and obligations associated with same to Plaintiffs and Class Members; g) make representations about the price or retail value of VOIs to Plaintiffs and Class Members; h) make representations about the increases in the resale price or retail value of VOIs to Plaintiffs and

Class Members; i) materially misrepresent the size, nature, extent, qualities, or characteristics of VOIs to Plaintiffs and Class Members; j) materially misrepresent the conditions under which Plaintiffs and Class Members may exchange the right to use accommodations in one location for the right to use accommodations in another location; k) materially misrepresent to Plaintiffs and Class Members the current or future availability of a resale or rental program offered by or on behalf of Defendants; l) materially misrepresent the nature or extent of benefits or incidental benefits to Plaintiffs and Class Members; m) misrepresent the purpose of meetings, describing them as "account reviews" to address a "problem" with Plaintiffs' or Class Members' accounts, and "account reviews" to describe "new" "plans," "programs," "deals" or "benefits," or "owner updates," when in actuality Plaintiffs and Class Members are attending high-pressure fraudulent sales meetings with the design to sell VOIs ; n) misrepresent the length of time for the meetings with Plaintiffs and Class Members; o) state to Plaintiffs and Class Members that the purchase of a timeshare interest constitutes a financial investment; p) breach Defendants' fiduciary duty owed to Plaintiffs and Class Members; q) fail to comply with the disclosure requirements to Plaintiffs and Class Members; r) use promotional devices without fully disclosing that the device is being used or offered for the purpose of soliciting sales of VOIs to Plaintiffs and Class Members; s) make assertions, representations or statements to Plaintiffs and Class Members that any incentives, including discounts, special prices, merchandise awards, types of memberships or other financial benefits, are only available to a Plaintiffs and Class Members for the remainder of the day or a limited period of time on which the assertion, representation or statement is made; t) fail to honor or comply with all the provisions of the contracts or reservation agreements with Plaintiffs and Class Members; u) obtain credit or financing for Plaintiffs or Class Members without their knowledge; v) misrepresent and conceal the amount of

fees to be charged to Plaintiffs and Class Members, including interest rates, management fees, maintenance fees or the structure for future fee increases; w) misrepresent to and conceal from Plaintiffs and Class Members the identity, function, or authority of a salesperson or team of salespersons; x) fail to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with Plaintiffs and Class Members; and y) misrepresent and conceal the Plaintiffs' and Class Members' rights to cancel or void a contract to purchase VOIs.

## VII.    REPRESENTATIVE PLAINTIFFS' ALLEGATIONS OF WRONGFUL CONDUCT BY DEFENDANTS

70.    In January 2015, Lawrence Couch and Linda Couch (the "Couches"), purchased 154,500 points while staying at Wyndham Nashville, 2415 McGavock Pike, Nashville, Tennessee, for $40,021.00.  The Couches financed the purchase through Defendants' financing program.

71.    Using the points purchased in January 2015, the Couches made a reservation to stay at Wyndham Branson at the Falls, 110 Willow Bend Drive, Branson, Missouri, in June 2015 for approximately four (4) days.

72.    Upon their arrival at Wyndham Branson at the Falls on or about June 11, 2015, and shortly after checking in, one of Defendants' employees (who did not identify himself as a sales representative) came to their unit to give them a "welcome gift," consisting of coupons to use at local attractions.  While in their unit, Defendants' employee asked the Couches if they were aware of Wyndham's "new financing deal."  Ms. Couch told Defendants' employee that the Couches had purchased points in January 2015 and obtained financing at that time and asked whether the "new financing deal" was something that Wyndham had implemented since January 2015.  Defendants' employee said "yes" and told them that they should come to the office for an "account review."

73.     Later in the day on or about June 11, 2015, the Couches went to the sales office for the "account review" and met with Scott Jackson, a sales representative for Defendants.  Mr. Jackson represented that the Couches could trade in their current points and purchase an additional 105,000 points using the "new financing deal" at a lower interest rate.  With the lower interest rate versus their current interest rate on the previous financing, Mr. Jackson represented to the Couches that their monthly payment would only increase by $30.00 to $35.00 per month.

74.     After a lengthy and high-pressure sales pitch based on lies, omissions, and concealment from Mr. Jackson, the Couches agreed to purchase more points and refinance based on Mr. Jackson's representations that their interest rate would be lower and there would only be a nominal increase in their monthly payment based on Defendants' financing,.  Thereafter, the Couches entered into a new contract whereby they traded in their current points under their prior contract and purchased an additional 105,000 points for $49,021.00.

75.     The Couches' contracts referenced above are in Defendants' possession.

76.     The Couches completed their vacation at Wyndham Branson at the Falls in Branson, Missouri, and then drove home to Shawnee, Kansas.  Shortly after returning home to Shawnee, Kansas, the Couches reviewed their prior contract that was financed and determined that there was no "new financing deal."  To the contrary, the former interest rate and the current interest rate were the same – 11.49%.

77.     The Couches contacted Scott Jackson and confronted him about the misrepresentations, omissions, and concealment by Mr. Jackson concerning their original contract, their new contract, and the represented lower interest rate and only nominal increase in their monthly

payment. Mr. Jackson advised the Couches that the five-day rescission period under Missouri law had expired and that there was nothing the Couches could do about it.

78.     As part of Defendants' standard mode of operation, Defendants monitor the accounts of owners staying at their resorts. Each day, Defendants' marketing and sales employees receive lists of owners or guests staying at their resorts which include the length of stay, the amount of ownership interest of each owner and the current terms and conditions of their respective ownership interests. Defendants' routinely and regularly use this information as tools to determine how to approach each owner or guest and what type of fraudulent sales methods to use under Defendants' "TAFT" scheme.     79.     Based on the foregoing, Defendants knew how much VOI the Couches owned and the terms of their ownership, including financing, monthly payments and interest rate.

80.     Further, based on the foregoing, Defendants knew that the Couches would be staying at Wyndham Branson at the Falls for several days after the sale while the rescission period ran and deceptively used this to Defendants' advantage.

81.     Defendants utilized various methods and tools under Defendants' "TAFT" scheme to dupe the Couches into purchasing more points, including but not limited to: a) use of a sales representative disguised as an employee simply delivering a "welcome gift," which was simply a tool used by Defendants for a sales representative to gain access to the Couches' unit; b) falsely describing a "new finance deal" to lure the Couches to the office for an "account review;" to subject the Couches to a high-pressure fraudulent sales pitch; c) making false and misleading statements and material omissions to the Couches regarding their current interest rate, including representations that the "new financing deal" would allow them to trade in their old points, purchase an additional 105,000 points and refinance their financing with Defendants at a lower interest rate, which would

result in only a nominal increase in their monthly payment; d) failing to exercise good faith and fair dealing; and e) failing to make full, fair and accurate disclosures of information based on material omissions, misrepresentations, and concealment.

82.    The Couches relied on Defendants' material omissions, misrepresentations, and concealment to their detriment. But for being told that the "new financing deal" would result in a lower interest rate and lower monthly payment, the Couches would not have purchased an additional 105,000 points for $49,021.00. Thus, the Couches have suffered harm as a result of Defendants' fraudulent sales scheme.

## VIII.   CLASS ALLEGATIONS

83.    Pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), Plaintiffs bring this action on behalf of themselves and all other persons similarly situated. In particular, they seek to represent a class of:

> All persons who purchased one or more timeshare interest(s)/vacation ownership interest(s) from Defendants in the United States of America or a U.S. Territory since December 22, 2008, excluding purchases made in Tennessee.

Excluded from coverage of the above class definition are: Defendants, each of the companies' officers, directors, and employees; any entity in which one or more of the companies has a controlling interest or which has a controlling interest in one or more of the companies, and that entity's officers, directors, and employees; the judge assigned to this case and his or her immediate family; all expert witnesses in this case; and all persons who make a timely election to be excluded from the class.

84.    Plaintiffs reserve their right to allege additional subclasses as warranted.

## A.    Plaintiffs meet the prerequisites of Rule 23(a)

85.    <u>Numerosity</u>.  The Class contains many thousands of individuals who have purchased VOIs from Defendants within the limitations period.  The Class is thus so numerous that joinder of all members would be impracticable.

86.    <u>Commonality</u>.  The answers to questions common to the Class will drive the resolution of this litigation.  Specifically, resolution of this case will be driven by questions relating to Defendants' fraudulent "TAFT" scheme described in this Complaint, including material omissions, misrepresentations, and concealment about Defendants' timeshare ownership program, Defendants' uniform and standardized material omissions, misrepresentations, and concealment about the Class Members' ability to use properties owned or operated by Defendants, or associated or affiliated with Defendants, Defendants' actions in selling VOIs to Class Members, and Defendants' actions in making their timeshare properties, and those associated or affiliated with Defendants, available for use by Class Members.

87.    The common questions of law and fact include:

a.  whether Defendants employed a scheme or artifice to defraud Class Members (*i.e.* prospective owners and current owners) in the advertising and sale of Defendants' timeshare ownership program;

b.  whether Defendants used false and misleading tactics to lure Class Members (*i.e.* prospective owners and current owners) to attend high-pressure sales meetings;

c.  whether Defendants misrepresented the nature, scope and length of meetings to Class Members;

d.  whether Defendants made misrepresentations to Class Members in the advertising and sale of Defendants' timeshare ownership program;

27

e.  whether Defendants omitted material information in the advertising and sale of Defendants' timeshare ownership program to Class Members;

f.  whether Defendants provided full, fair and accurate disclosures to Class Members regarding the purchase of VOIs and the Class Members' rights and obligations associated with same;

g.  whether Defendants owed a duty to Class Members to disclose information;

h.  whether Defendants fraudulently induced Class Members to enter into contracts for the purchase of VOIs;

i.  whether Defendants' misrepresentations, omissions, and concealment were material;

j.  whether Defendants actions were deliberate;

k.  whether any misrepresentations, omissions, and concealment by Defendants caused the Class Members' injuries;

l.  whether Defendants violated the state and U.S. territory timeshare laws.

m.  whether Defendants violated the state and U.S. territory consumer protection and unfair and deceptive trade practice laws.

n.  whether Defendants breached their contracts with Class Members;

o.  whether Defendants breached their duty of good faith and fair dealing with Class Members; and

p.  whether Defendants should be required to disgorge profits to Class Members.

88.  <u>Typicality</u>.  Plaintiffs have the same interests as all Class Members they seek to represent, and all of Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members.  Plaintiffs and all Class Members purchased VOIs at one or more of Defendants' resorts.

All of the claims of Plaintiffs and Class Members arise out of Defendants' omissions, misrepresentations, and concealment of material facts and other wrongful conduct regarding the nature and availability of the timeshare interests they sold to Class Members, and their policies and procedures regarding marketing, selling, and facilitating Plaintiffs' and the Class Members' use of those interests.

89.    <u>Adequacy</u>.  Plaintiffs will fairly and adequately represent and protect the interest of Class Members:  Plaintiffs' interests align with those of Class Members, and Plaintiffs have no fundamental conflicts with the Class.  Plaintiffs have retained counsel competent and experienced in class action litigation, including consumer fraud, who will fairly and adequately represent the Class.

### B.    Plaintiffs meet the prerequisites of Rule 23(b)(2)

90.    An injunction should be issued enjoining Defendants from the continuation of their fraudulent "TAFT" scheme.  Further, Defendants should be enjoined from continuing to violate the laws of the state and U.S. territories described herein.  Additionally, that an injunction be issued declaring that Plaintiffs' and Class Members have a right to rescind their contracts and that Defendants must disgorge profits received from Plaintiffs and Class Members.

### C.    Plaintiffs meet the prerequisites of Rule 23(b)(3)

91.    <u>Predominance and Superiority</u>.  The common questions of law and fact enumerated above predominate over the questions affecting only individual Class Members, and a class action is superior to other methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable.  Defendants have acted under a uniform fraudulent scheme with respect to the Class.

92.     Defendants are sophisticated parties with substantial resources, while Class Members are not, and prosecution of this litigation is likely to be expensive.  Because the economic damages suffered by any individual Class Member may be relatively modest compared to the expense and burden of individual litigation, and because individual suits pursuing those damages would burden the courts and take many years to complete, it would be impracticable for the many thousands of Class Members to seek redress individually for Defendants' unlawful and wrongful conduct as alleged herein.

93.     The fraudulent conduct and ongoing harm to the Class described above counsel in favor of swiftly and efficiently managing this case as a class action, which preserves judicial resources and minimizes the possibility of serial or inconsistent adjudications.

94.     Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  Absent a class action, Class Members will continue to have wrongfully obtained contracts and related obligations foisted upon them, and further be restricted from using their timeshare interests while incurring monetary damages, and Defendants' misconduct will continue without remedy, while their ill-gotten profits will grow at the expense of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

95.     There will be no undue difficulty in the management of this litigation as a class action.

**D.     The proposed class is ascertainable.**

96.     The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class.  The Class consists of purchasers and

30

owners of Defendants' VOIs, and class membership can be determined using contracts, deeds, receipts, ownership documentation, communications, and records in Defendants' possession.

## IX.    STATUTES OF LIMITATIONS, FRAUDULENT CONCEALMENT AND ESTOPPEL

### A.    Discovery Rule

97.    The causes of action did not accrue until Plaintiffs and Class Members discovered, or could have discovered with reasonable diligence, the facts misrepresented, omitted and concealed by Defendants.

### B.    Fraudulent Concealment

98.    Any applicable statutes of limitation have been tolled by Defendants' knowing, active, and ongoing concealment and denial of the material facts as alleged herein.  Defendants are sophisticated parties with superior knowledge of complex real estate and business transactions. Defendants were and are under a continuous duty to disclose to Plaintiffs and Class Members the material facts alleged herein, and Plaintiffs and Class Members reasonably relied on Defendants' knowing, affirmative, and ongoing misrepresentations and concealment.

99.    Plaintiffs and the Class Members have been kept ignorant by Defendants of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

### C.    Estoppel

100.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the timeshare interests and transactions as alleged

31

herein.  Those misrepresentations and concealment are ongoing.  Plaintiffs and Class Members reasonably relied on Defendants' misrepresentations, knowing failure to disclose and/or active concealment of those facts.  Defendants are estopped from relying on any statutes of limitation in defense of this action.  Additionally, Defendants are estopped from raising any defense of laches due to its own conduct as alleged herein.

101.    Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Defendants:

a.  <u>Who</u>:  Defendants identified in this Complaint, and their agents, servants, and employees utilized a fraudulent scheme to encourage the active concealment of legally required disclosures (including but not limited to the fact that Plaintiffs had a right to rescind the purchase) and other material facts about the timeshare interests and timeshare transactions from Plaintiffs and Class Members while simultaneously misrepresenting facts such that Plaintiffs and Class Members could use their timeshare units whenever they wished, as alleged above.  Plaintiffs are unaware of, and therefore unable to identify, all the names and identities of those specific individuals at Defendants responsible for such decisions, but they include Scott Jackson identified in Paragraphs 73-77 of this Complaint, and high-ranking officials of Defendants, such as Jeff Myers, Chief Sales & Marketing Officer.

b.  <u>What</u>:  Defendants knowingly misrepresent and fail to disclose to purchasers that: the availability of resorts properties are restricted due to Defendants' oversale of points; Defendants restrict the availability of resort properties through rentals and/or units used as part of Defendants' sales process; and Plaintiffs and Class Members will not be able to use a resort property they desire and/or at the dates they desire.

c.  <u>When</u>:  Defendants  concealed material information starting no later than December 22, 2008, and on an ongoing basis, and continuing to this day, as alleged above. Defendants have not adequately disclosed the truth about the true nature and availability of timeshare properties at resorts owned or operated by Defendants, or associated or affiliated resorts, nor purchasers' legal rights including the right to rescind the transaction.  Defendants have not taken action to inform Plaintiffs or Class Members about the true nature and availability of the timeshare properties at resorts owned or operated by Defendants, or associated or affiliated resorts, or purchasers' rights with respect to the transactions.   And when Plaintiffs or Class Members complained to Defendants about the unavailability of properties, Defendants denied any knowledge of or responsibility for the problem; but instead, simply used this as a marketing tool to make additional misrepresentations to induce Plaintiffs and Class Members to increase their ownership interest and purchase additional points with the promise of increased availability or priority.

d.  <u>Where</u>:  Defendants concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, in their communications with Plaintiffs and Class Members and made misrepresentations about the nature and availability of the timeshare properties and the purchasers' rights in the transaction.  Plaintiffs are aware of no document, communication, or other place or thing, in which Defendants disclosed the truth about the lack of availability of timeshare properties.

e.  <u>How</u>:  Defendants misrepresented, omitted, and concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, at all times, even though Defendants knew about the lack of availability of timeshare properties due to Defendants' artificial restriction of them, and about the legally required disclosures

(including the right to rescind), and knew that this information would be important to a reasonable consumer.  Defendants misrepresented, omitted, and concealed this information by using high-pressure fraudulent sales methods and commission-based sales agents, who were instructed and trained by Defendants to utilize a uniform and standardized fraudulent sales scheme.

f.  <u>Why</u>:  Defendants actively misrepresented, omitted, and concealed material information about the timeshare transactions, the purchasers' ability to use their purchase, and each purchaser's right to rescind the transaction for the purpose of inducing Plaintiffs and Class Members to purchase VOIs, and once they owned VOIs, to purchase additional VOIs from Defendants.  Had Defendants disclosed the truth, for example in their sales pitches, advertisements, or other materials or communications, Plaintiffs and Class Members would have been aware of this information, and would not have bought timeshare interests.

## X.    WRITTEN TOLLING AGREEMENTS AND EQUITABLE TOLLING

102.    On or about May 1, 2018, Defendants entered into a written tolling agreement with Lawrence Couch and Linda Couch, tolling any and all statute of limitations related to any and all claims that the Couches may have against Defendants.  Per the written tolling agreement, which is in Defendants' possession, the parties could terminate same at any point by giving written notice. Upon written notice of termination, the tolling period extends an additional sixty (60) days.

103.    The Couches' applicable statute of limitations did not begin running again after the written notice to terminate the tolling agreement because the tolling agreement specifically provides that the Couches could file a lawsuit "thirty (30) days after the termination date" and "[t]he tolling period shall extend sixty (60) days beyond termination."

104.     Defendants terminated the written tolling agreement with the Couches on October 23, 2018. The Couches have filed this action within sixty (60) days beyond termination.

105.     Upon information and belief, some or all of the Defendants have entered into written tolling agreements with hundreds of owners containing similar language regarding written notice to terminate and the extension of the tolling period for an additional sixty (60) days beyond termination.

106.     In addition, the applicable statute of limitations of any and all Class Members are equitably tolled under the *American Pipe* doctrine.

## COUNT ONE
## VIOLATIONS OF STATE AND U.S. TERRITORY TIMESHARE LAWS

107.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

108.     As reflected in the facts alleged in this Complaint, Defendants have violated and continue to violate the timeshare laws of the states and U.S. territory listed below, including but not limited to the following actions or inactions: a) make false or misleading statements in the advertisement and sale of VOIs to Plaintiffs and Class Members; b) omit and conceal material facts in the advertisement and sale of VOIs to Plaintiffs and Class Members; c) employ a scheme or artifice to defraud Plaintiffs and Class Members; d) fail to exercise good faith in dealing with Plaintiffs and Class Members; e) create a false impression regarding Defendants' current vacation ownership plan or future plans with Plaintiffs and Class Members; f) fail to provide full and fair disclosures of information regarding the purchase of VOIs and the purchaser's rights and obligations associated with same to Plaintiffs and Class Members; g) make representations about the price or retail value of VOIs to Plaintiffs and Class Members; h) make representations about the increases in

35

the resale price or retail value of VOIs to Plaintiffs and Class Members; i) materially misrepresent the size, nature, extent, qualities, or characteristics of VOIs to Plaintiffs and Class Members; j) materially misrepresent the conditions under which Plaintiffs and Class Members may exchange the right to use accommodations in one location for the right to use accommodations in another location; k) materially misrepresent to Plaintiffs and Class Members the current or future availability of a resale or rental program offered by or on behalf of Defendants; l) materially misrepresent the nature or extent of benefits or incidental benefits to Plaintiffs and Class Members; m) misrepresent the purpose of meetings, describing them as "account reviews" to address a "problem" with Plaintiffs' or Class Members' accounts, and "account reviews" to describe "new" "plans," "programs," "deals" or "benefits," or "owner updates," when in actuality Plaintiffs and Class Members are attending high-pressure fraudulent sales meetings with the design to sell VOIs; n) misrepresent the length of time for the meetings with Plaintiffs and Class Members; o) state to Plaintiffs and Class Members that the purchase of a timeshare interest constitutes a financial investment; p) breach Defendants' fiduciary duty owed to Plaintiffs and Class Members; q) fail to comply with the disclosure requirements to Plaintiffs and Class Members; r) use promotional devices without fully disclosing that the device is being used or offered for the purpose of soliciting sales of VOIs to Plaintiffs and Class Members; s) make assertions, representations or statements to Plaintiffs and Class Members that any incentives, including discounts, special prices, merchandise awards, types of memberships or other financial benefits, are only available to a Plaintiffs and Class Members for the remainder of the day or a limited period of time on which the assertion, representation or statement is made; t) fail to honor or comply with all the provisions of the contracts or reservation agreements with Plaintiffs and Class Members; u) obtain credit or financing for Plaintiffs or Class Members without their

knowledge; v) misrepresent and conceal the amount of fees to be charged to Plaintiffs and Class Members, including interest rates, management fees, maintenance fees or the structure for future fee increases; w) misrepresent to and conceal from Plaintiffs and Class Members the identity, function, or authority of a salesperson or team of salespersons; x) fail to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with Plaintiffs and Class Members; and y) misrepresent and conceal the Plaintiffs' and Class Members' rights to cancel or void a contract to purchase VOIs.

109.    Defendants' conduct has violated and continues to violate the Arizona Timeshare statute, A.R.S. § 32-2201 *et seq.*

110.    Defendants' conduct has violated and continues to violate the Arkansas Time Share Act, § 18-14-101 *et seq.*

111.    Defendants' conduct has violated and continues to violate the California Vacation Ownership and Timeshare Act, Cal. Bus. & Prof.  Code § 11210, *et seq.*

112.    Defendants' conduct has violated and continues to violate the Florida Vacation Plan and Timesharing Act, Fla. Stat. § 721.01 *et seq.*

113.    Defendants' conduct has violated and continues to violate the Georgia Timeshare Act, O.C.G.A. § 44-3-160 *et seq*.

114.    Defendants' conduct has violated and continues to violate the Hawaii Timeshare Act, HRS § 514E-1, *et seq.*

115.    Defendants' conduct has violated and continues to violate the Idaho Subdivided Land Disposition Act, Idaho Code Ann. § 55-1801, *et seq.*

116.    Defendants' conduct has violated and continues to violate the Louisiana Timeshare Act, LSA-R.S. § 9:1131.1, *et seq.*

117.    Defendants' conduct has violated and continues to violate the Maryland Real Estate Time-Sharing Act, Md. Code Ann. Real Prop. § 11A-101, *et seq.*

118.    Defendants' conduct has violated and continues to violate the Massachusetts Real Estate Time-Share Act, M.G.L.A. 183B § 1, *et seq.*

119.    Defendants' conduct has violated and continues to violate the Montana Timeshare Act, § 37-53-101 *et seq.*,

120.    Defendants' conduct has violated and continues to violate the Nevada Timeshare Law, N. R. S. § 119A.010, *et seq.*

121.    Defendants' conduct has violated and continues to violate the New Hampshire Land Sales Full Disclosure Act, XXXI N.H. Rev. Stat. Ann. § 356-A:1, *et seq.*, and the Condominium Act, XXXI N.H. Rev. Stat. Ann. § 356-B:1, *et seq.*

122.    Defendants' conduct has violated and continues to violate the New Jersey Real Estate and Timeshare Act, N.J.S.A. 45:15-16.50, *et seq.*

123.    Defendants' conduct has violated and continues to violate the New Mexico Time Share Act, § 47-11-1 *et seq.*

124.    Defendants' conduct has violated and continues to violate the New York Timeshare Offering Plan Act, 13 CRR-NY 24.6.

125.    Defendants' conduct has violated and continues to violate the North Carolina Time Share Act, N.C. Gen. Stat. Ann. § 93A-39, *et seq.*

126.    Defendants' conduct has violated and continues to violate the Oregon Time Share statute, ORS § 94.803, *et seq.*

127.    Defendants' conduct has violated and continues to violate the Puerto Rico Timeshare and Vacation Club Act, P.R. Laws Ann. Tit. 31 LPRA § 1251, *et seq*.

128.    Defendants' conduct has violated and continues to violate the Rhode Island Real Estate Timeshare Act, 34 R.I. Gen. Laws Ann. § 34-41-1.01, *et seq*.

129.    Defendants' conduct has violated and continues to violate the South Carolina Vacation Time Sharing Plans Act, S.C. St. § 27-32-10, *et seq*.

130.    Defendants' conduct has violated and continues to violate the Texas Timeshare Act, V.T.C.A., Property Code § 221.001, *et seq*.

131.    Defendants' conduct has violated and continues to violate the Utah Timeshare and Camp Resort Act, U.C.A. 1953 § 57-19-1, *et seq*.

132.    Defendants' conduct has violated and continues to violate the Washington Timeshare Act, RCW § 64.36, *et seq*.

133.    Defendants' conduct has violated and continues to violate the Wisconsin's Time-Share Ownership Act, WSA, 707.01, *et seq*.

134.    As a result of Defendants' fraudulent scheme, Plaintiffs and Class Members purchased VOIs that they would not have otherwise purchased and have suffered harm, including the loss of millions of dollars.

**COUNT TWO**
**VIOLATIONS OF STATE AND U.S. TERRITORY CONSUMER PROTECTION AND UNFAIR AND DECEPTIVE TRADE PRACTICE LAWS**

135.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

136.    As reflected in the facts alleged in this Complaint, Defendants have and continue to engage in deceptive and unfair trade practice in violation of the consumer protection laws of the states and U.S. territory listed below, including but not limited to the following actions or inactions: a) make false or misleading statements in the advertisement and sale of VOIs to Plaintiffs and Class Members; b) omit and conceal material facts in the advertisement and sale of VOIs to Plaintiffs and Class Members; c) employ a scheme or artifice to defraud Plaintiffs and Class Members; d) fail to exercise good faith in dealing with Plaintiffs and Class Members; e) create a false impression regarding Defendants' current vacation ownership plan or future plans with Plaintiffs and Class Members; f) fail to provide full and fair disclosures of information regarding the purchase of VOIs and the purchaser's rights and obligations associated with same to Plaintiffs and Class Members; g) make representations about the price or retail value of VOIs to Plaintiffs and Class Members; h) make representations about the increases in the resale price or retail value of VOIs to Plaintiffs and Class Members; i) materially misrepresent the size, nature, extent, qualities, or characteristics of VOIs to Plaintiffs and Class Members; j) materially misrepresent the conditions under which Plaintiffs and Class Members may exchange the right to use accommodations in one location for the right to use accommodations in another location; k) materially misrepresent to Plaintiffs and Class Members the current or future availability of a resale or rental program offered by or on behalf of Defendants; l) materially misrepresent the nature or extent of benefits or incidental benefits to Plaintiffs and Class Members; m) misrepresent the purpose of meetings, describing them as "account reviews" to address a "problem" with Plaintiffs' or Class Members' accounts, and "account reviews"

to describe "new" "plans," "programs," "deals" or "benefits," or "owner updates," when in actuality Plaintiffs and Class Members are attending high-pressure fraudulent sales meetings with the design to sell VOIs; n) misrepresent the length of time for the meetings with Plaintiffs and Class Members; o) state to Plaintiffs and Class Members that the purchase of a timeshare interest constitutes a financial investment; p) breach Defendants' fiduciary duty owed to Plaintiffs and Class Members; q) fail to comply with the disclosure requirements to Plaintiffs and Class Members; r) use promotional devices without fully disclosing that the device is being used or offered for the purpose of soliciting sales of VOIs to Plaintiffs and Class Members; s) make assertions, representations or statements to Plaintiffs and Class Members that any incentives, including discounts, special prices, merchandise awards, types of memberships or other financial benefits, are only available to a Plaintiffs and Class Members for the remainder of the day or a limited period of time on which the assertion, representation or statement is made; t) fail to honor or comply with all the provisions of the contracts or reservation agreements with Plaintiffs and Class Members; u) obtain credit or financing for Plaintiffs or Class Members without their knowledge; v) misrepresent and conceal the amount of fees to be charged to Plaintiffs and Class Members, including interest rates, management fees, maintenance fees or the structure for future fee increases; w) misrepresent to and conceal from Plaintiffs and Class Members the identity, function, or authority of a salesperson or team of salespersons; x) fail to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with Plaintiffs and Class Members; and y) misrepresent and conceal the Plaintiffs' and Class Members' rights to cancel or void a contract to purchase VOIs.

137.    Defendants' conduct has violated and continues to violate the Arizona Consumer Fraud Act, A.R.S. § 44–1521, *et seq*.

41

138.     Defendants' conduct has violated and continues to violate the California Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.*

139.     Defendants' conduct has violated and continues to violate the Colorado Consumer Protection Act, C.R.S. § 6-1-101, *et seq.*

140.     Defendants' conduct has violated and continues to violate the Florida Deceptive and Unfair Trade Practices Act, Fla. Stats. § 501.201, *et seq.*,

141.     Defendants' conduct has violated and continues to violate the Hawaii Revised Statute, HRS § 480-1, *et seq.*

142.     Defendants' conduct has violated and continues to violate the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*

143.     Defendants' conduct has violated and continues to violate the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 I.L.C.S. § 505/1, *et seq.*

144.     Defendants' conduct has violated and continues to violate the Maryland Consumer Protection Act (MCPA), M.C.C.L. § 13–101, *et seq.*

145.     Defendants' conduct has violated and continues to violate the Massachusetts Regulation of Businesses Practice and Consumer Protection Act, M.G.L. 93A § 1, *et seq.*

146.     Defendants' conduct has violated and continues to violate the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*

147.     Defendants' conduct has violated and continues to violate the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*

148.     Defendants' conduct has violated and continues to violate the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2-101, *et seq.*

149.    Defendants' conduct has violated and continues to violate the New Jersey Trade Names, Trade-Marks and Unfair Practices Act, N.J. Stat. Ann. 56:1-1, *et seq.*

150.    Defendants' conduct has violated and continues to violate the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*

151.    Defendants' conduct has violated and continues to violate New York Gen. Bus. Law § 349, *et seq.*

152.    Defendants' conduct has violated and continues to violate the North Carolina Gen. Stat. § 75-1, *et seq.*

153.    Defendants' conduct has violated and continues to violate the Oklahoma Consumer Protection Act, 15 Okla. Stat. Ann. § 751, *et seq.*

154.    Defendants' conduct has violated and continues to violate the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.*

155.    Defendants' conduct has violated and continues to violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, *et seq.*

156.    Defendants' conduct has violated and continues to violate the Rhode Island Deceptive Trade Practices Act, R.I. Stat. § 6-13.1 *et seq.*

157.    Defendants' conduct has violated and continues to violate the Texas Deceptive Trade Practices and Consumer Protection Act, § 17.44, *et seq.*

158.    Defendants' conduct has violated and continues to violate the Utah Consumer Practices Act, U.C.A. 1953 § 13–11–1, *et seq.*

159.    Defendants' conduct has violated and continues to violate the Vermont Consumer Fraud Act, V.S.A. 9 § 2451, *et seq.*

43

160.    Defendants' conduct has violated and continues to violate the Virgin Islands Deceptive Trade Practices Act, 12A V.I.C. § 301, *et seq.*

161.    Defendants' conduct has violated and continues to violate the Virginia Consumer Protection Act of 1977, Title 59.1-196, *et seq.*

162.    Defendants' conduct has violated and continues to violate the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.*

163.    Defendants' conduct has violated and continues to violate the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, *et seq.*

164.    As a result of Defendants' fraudulent scheme, Plaintiffs and Class Members purchased VOIs that they would not have otherwise purchased and have suffered harm, including the loss of millions of dollars.

## COUNT THREE
## UNJUST ENRICHMENT

165.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

166.    Plaintiffs and Class Members conferred benefits upon Defendants in the form of down payments, monthly mortgage payments, financing charges, financing interest, recurring maintenance fee payments, and additional fee and membership payments in connection with their purchase of VOIs.

167.    Those payments were made with the reasonable expectation that Defendants were selling VOIs that could be used by Plaintiffs and Class Members as represented by Defendants.

168.    It would be unjust to permit Defendants to keep the payments made by Plaintiffs and Class Members because Defendants induced Plaintiffs and Class Members to make those payments by making misrepresentations and failing to disclose the facts material to the transactions.

169.    Plaintiffs and Class Members seek restitution.

## COUNT FOUR
## FRAUD IN THE INDUCEMENT

170.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

171.    Defendants have engaged and engage in high-pressure sales tactics based on fraud and deception with material omissions, misrepresentations, and concealment designed to induce Plaintiffs and Class Members to enter contracts with inaccurate and incomplete information.

172.    Defendants have engaged and engage in the following actions or inactions: a) make false or misleading statements in the advertisement and sale of VOIs to Plaintiffs and Class Members; b) omit and conceal material facts in the advertisement and sale of VOIs to Plaintiffs and Class Members; c) employ a scheme or artifice to defraud Plaintiffs and Class Members; d) fail to exercise good faith in dealing with Plaintiffs and Class Members; e) create a false impression regarding Defendants' current vacation ownership plan or future plans with Plaintiffs and Class Members; f) fail to provide full and fair disclosures of information regarding the purchase of VOIs and the purchaser's rights and obligations associated with same to Plaintiffs and Class Members; g) make representations about the price or retail value of VOIs to Plaintiffs and Class Members; h) make representations about the increases in the resale price or retail value of VOIs to Plaintiffs and Class Members; i) materially misrepresent the size, nature, extent, qualities, or characteristics of VOIs to Plaintiffs and Class Members; j) materially misrepresent the conditions under which

Plaintiffs and Class Members may exchange the right to use accommodations in one location for the right to use accommodations in another location; k) materially misrepresent to Plaintiffs and Class Members the current or future availability of a resale or rental program offered by or on behalf of Defendants; l) materially misrepresent the nature or extent of benefits or incidental benefits to Plaintiffs and Class Members; m) misrepresent the purpose of meetings, describing them as "account reviews" to address a "problem" with Plaintiffs' or Class Members' accounts, and "account reviews" to describe "new" "plans," "programs," "deals" or "benefits," or "owner updates," when in actuality Plaintiffs and Class Members are attending high-pressure fraudulent sales meetings with the design to sell VOIs ; n) misrepresent the length of time for the meetings with Plaintiffs and Class Members; o) state to Plaintiffs and Class Members that the purchase of a timeshare interest constitutes a financial investment; p) breach Defendants' fiduciary duty owed to Plaintiffs and Class Members; q) fail to comply with the disclosure requirements to Plaintiffs and Class Members; r) use promotional devices without fully disclosing that the device is being used or offered for the purpose of soliciting sales of VOIs to Plaintiffs and Class Members; s) make assertions, representations or statements to Plaintiffs and Class Members that any incentives, including discounts, special prices, merchandise awards, types of memberships or other financial benefits, are only available to a Plaintiffs and Class Members for the remainder of the day or a limited period of time on which the assertion, representation or statement is made; t) fail to honor or comply with all the provisions of the contracts or reservation agreements with Plaintiffs and Class Members; u) obtain credit or financing for Plaintiffs or Class Members without their knowledge; v) misrepresent and conceal the amount of fees to be charged to Plaintiffs and Class Members, including interest rates, management fees, maintenance fees or the structure for future fee increases; w) misrepresent to and conceal from

46

Plaintiffs and Class Members the identity, function, or authority of a salesperson or team of salespersons; x) fail to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with Plaintiffs and Class Members; and y) misrepresent and conceal the Plaintiffs' and Class Members' rights to cancel or void a contract to purchase VOIs.

173.    Defendants had and have an affirmative duty to comply with timeshare laws, and consumer protection and unfair and deceptive trade practice laws, as described in Counts One and Two, incorporated by reference herein.

174.    As timeshare licensees, Defendants' agents were and are required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and provide timely and accurate information regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

175.    By utilizing an unlawful fraudulent scheme and/or misrepresenting, omitting, or concealing materials facts, Defendants misrepresented, fraudulently omitted and concealed material information (and continue to do so) in violation of applicable common law and statutory law.

176.    Defendants knew, or should have known, that they were and are misrepresenting, omitting, and concealing material facts.  The misrepresentations, omissions, and concealment described herein were material in nature, and were made to induce Plaintiffs and Class Members to enter contracts.

177.    Plaintiffs and Class Members reasonably and justifiably relied upon Defendants' misrepresentations, omissions, and concealment of material facts in deciding to purchase the timeshare interests.  Defendants knew of the falsity of the misrepresentations, omissions, and concealment of material fact, or had utter disregard for their truth.  Defendants intended to induce

reliance upon the misrepresentations, omissions, and concealment of material fact.  Plaintiffs and Class Members were entitled to rely upon the facts as represented.

178.    Plaintiffs' reliance and Class Members' reliance was reasonable under the circumstances.

179.    Plaintiffs and Class Members were injured and damaged by virtue of their reliance on the facts as represented by Defendants.  Had Plaintiffs and Class Members known the truth, they would not have entered into contracts with Defendants.

180.    Defendants' misrepresentations, omissions, and concealment were intentionally made for the purpose of inducing Plaintiffs and Class Members to enter contracts with Defendants. Defendants' sales agents work on commission, and received commissions from the sale to Plaintiffs and Class Members.   In the alternative, if Defendants' misrepresentations, omissions, and concealment were not intentional, they were negligent, as Defendants knew or should have known the truth regarding Defendants' policies and procedures.

181.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Defendants, and their actions, which were performed in the scope of their employment with Defendants, are attributable to Defendants pursuant to the doctrine of *respondeat superior.*

182.    For all of the reasons set forth herein, Plaintiffs and Class Members were induced to enter into contracts with Defendants by fraud.  The misrepresentations, omissions, and concealment of material fact, combined with the high-pressure fraudulent sales tactics based on fraud and deception, and the nature of the written documents between the parties were all part of a fraudulent

scheme devised to induce Plaintiffs and Class Members to buy timeshare interests from Defendants at substantial cost to Plaintiffs and Class Members.

183.    The sales, and any contracts between the parties, should be rescinded, with all sums paid returned to Plaintiffs and Class Members and with the timeshare interests returned to Defendants.  In addition, Plaintiffs and Class Members should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent scheme of Defendants.

## COUNT FIVE
## FRAUD

184.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

185.    Defendants fraudulent scheme includes material omissions, misrepresentations, and concealment designed to induce Plaintiffs and Class Members to remain in contracts (including through the rescission period) and to purchase additional timeshare interests.

186.    Defendants have engaged and engage in the following actions or inactions: a) make false or misleading statements in the advertisement and sale of VOIs to Plaintiffs and Class Members; b) omit and conceal material facts in the advertisement and sale of VOIs to Plaintiffs and Class Members; c) employ a scheme or artifice to defraud Plaintiffs and Class Members; d) fail to exercise good faith in dealing with Plaintiffs and Class Members; e) create a false impression regarding Defendants' current vacation ownership plan or future plans with Plaintiffs and Class Members; f) fail to provide full and fair disclosures of information regarding the purchase of VOIs and the purchaser's rights and obligations associated with same to Plaintiffs and Class Members; g) make representations about the price or retail value of VOIs to Plaintiffs and Class Members; h)

make representations about the increases in the resale price or retail value of VOIs to Plaintiffs and Class Members; i) materially misrepresent the size, nature, extent, qualities, or characteristics of VOIs to Plaintiffs and Class Members; j) materially misrepresent the conditions under which Plaintiffs and Class Members may exchange the right to use accommodations in one location for the right to use accommodations in another location; k) materially misrepresent to Plaintiffs and Class Members the current or future availability of a resale or rental program offered by or on behalf of Defendants; l) materially misrepresent the nature or extent of benefits or incidental benefits to Plaintiffs and Class Members; m) misrepresent the purpose of meetings, describing them as "account reviews" to address a "problem" with Plaintiffs' or Class Members' accounts, and "account reviews" to describe "new" "plans," "programs," "deals" or "benefits," or "owner updates," when in actuality Plaintiffs and Class Members are attending high-pressure fraudulent sales meetings with the design to sell VOIs ; n) misrepresent the length of time for the meetings with Plaintiffs and Class Members; o) state to Plaintiffs and Class Members that the purchase of a timeshare interest constitutes a financial investment; p) breach Defendants' fiduciary duty owed to Plaintiffs and Class Members; q) fail to comply with the disclosure requirements to Plaintiffs and Class Members; r) use promotional devices without fully disclosing that the device is being used or offered for the purpose of soliciting sales of VOIs to Plaintiffs and Class Members; s) make assertions, representations or statements to Plaintiffs and Class Members that any incentives, including discounts, special prices, merchandise awards, types of memberships or other financial benefits, are only available to a Plaintiffs and Class Members for the remainder of the day or a limited period of time on which the assertion, representation or statement is made; t) fail to honor or comply with all the provisions of the contracts or reservation agreements with Plaintiffs and Class Members; u) obtain credit or financing for

Plaintiffs or Class Members without their knowledge; v) misrepresent and conceal the amount of fees to be charged to Plaintiffs and Class Members, including interest rates, management fees, maintenance fees or the structure for future fee increases; w) misrepresent to and conceal from Plaintiffs and Class Members the identity, function, or authority of a salesperson or team of salespersons; x) fail to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with Plaintiffs and Class Members; and y) misrepresent and conceal the Plaintiffs' and Class Members' rights to cancel or void a contract to purchase VOIs.

187.    Defendants had and have an affirmative duty under the timeshare laws, and consumer protection and unfair and deceptive trade practice laws, as described in Counts One and Two, incorporated by reference herein.

188.    By utilizing an unlawful fraudulent scheme and/or misrepresenting, omitting, or concealing materials facts, Defendants misrepresented, fraudulently omitted and concealed material information (and continue to do so) in violation of applicable common law and statutory law.

189.    Defendants knew, or should have known, that they were and are misrepresenting, omitting, and concealing material facts.  The misrepresentations, omissions, and concealment described herein were material in nature, and were made to induce Plaintiffs and Class Members to remain in contracts (including through the rescission period) and to purchase additional timeshare interests.

190.    Plaintiffs and Class Members reasonably and justifiably relied upon Defendants' misrepresentations, omissions, and concealment of material facts to remain in contracts (including through the rescission period) and to purchase additional timeshare interests.  Defendants knew of the falsity of the misrepresentations, omissions, and concealment of material fact, or had utter

disregard for their truth.  Defendants intended to induce reliance upon the misrepresentations, omissions, and concealment of material fact.  Plaintiffs and Class Members were entitled to rely upon the facts as represented.

191.    Plaintiffs' reliance and Class Members' reliance was reasonable under the circumstances.

192.    Plaintiffs and Class Members were injured and damaged by virtue of their reliance on the facts as represented by Defendants.  Had Plaintiffs and Class Members known the truth, they would not have remained in the contracts (including through the rescission period) or purchased additional timeshare interests.

193.    Defendants' misrepresentations, omissions, and concealment were intentionally made for the purpose of inducing Plaintiffs and Class Members to remain in the contracts (including through the rescission period) or purchase additional timeshare interests with Defendants.  Under both scenarios, Defendants' sales agents, who work on commission, receive commissions from the sale to Plaintiffs and Class Members.   In the alternative, if Defendants' misrepresentations, omissions, and concealment were not intentional, they were negligent, as Defendants knew or should have known the truth regarding Defendants' policies and procedures.

194.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Defendants, and their actions, which were performed in the scope of their employment with Defendants, are attributable to Defendants pursuant to the doctrine of *respondeat superior*.

195.    For all of the reasons set forth herein, Plaintiffs and Class Members were induced to remain in the contracts (including through the rescission period) or purchase additional timeshare

interests with Defendants by fraud. The misrepresentations, omissions, and concealment of material fact, combined with the high-pressure fraudulent sales tactics based on fraud and deception to purchase additional timeshare interests, and the nature of the written documents between the parties were and are all part of a fraudulent scheme devised to induce Plaintiffs and Class Members to remain in the contracts (including through the rescission period) or purchase additional timeshare interests from Defendants at substantial cost to Plaintiffs and Class Members while Defendants continue to unlawfully and wrongfully profit.

196.    The sales, and any contracts between the parties, should be rescinded, with all sums paid returned to Plaintiffs and Class Members and with the timeshare interests returned to Defendants. In addition, Plaintiffs and Class Members should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent scheme of Defendants.

**COUNT SIX**
**BREACH OF CONTRACT (COVENANT OF GOOD FAITH AND FAIR DEALING)**

197.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

198.    Plaintiffs and Class Members contracted with Defendants to purchase vacation ownership interests in the form of points for use at resorts owned or operated by Defendants, or Defendants' affiliated or associated resorts.

199.    Good faith is an element of every contract pertaining to the purchase of VOIs. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the

letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

200.   Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

201.   Defendants breached their contracts with Plaintiffs and Class Members, including the covenant of good faith and fair dealing, through Defendants' misrepresentations, material omissions and practices as alleged herein.

202.   Plaintiffs and Class Members have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

203.   Plaintiffs and Class Members have sustained damages as a result of Defendants' conduct.

204.   As a result of these breaches, the contracts should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs and Class Members.

**COUNT SEVEN**
**BREACH OF CONTRACT**

205.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

206.   Plaintiffs and Class Members contracted with Defendants to purchase vacation ownership interests in the form of points for use at resorts owned or operated by Defendants, or Defendants' affiliated or associated resorts.

54

207.    The contracts referenced above are in Defendants' possession.

208.    Defendants breached their contracts with Plaintiffs and Class Members through Defendants' misrepresentations, material omissions and practices as alleged herein, specifically including (but not limited to) Defendants' failure to adequately disclose to Plaintiffs and Class Members that Defendants artificially restricted the availability of timeshare units, Defendants' scheme to avoid providing required disclosures, and Defendants' failure to provide the Plaintiffs and Class Members the opportunity to use and enjoy their purchases.

209.    Plaintiffs and Class Members have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

210.    Plaintiffs and Class Members have sustained damages as a result of Defendants' breach of the contract, including but not limited to the funds lost as described herein, and the lack of use and enjoyment of the resorts owned and operated by Defendants, or Defendants' associates or affiliates.

211.    As a result of these breaches, the contracts should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs and Class Members.

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiffs respectfully request:

212.    This action to be certified pursuant to FED. R. CIV. P. 23(a), (b)(2), (b)(3), and (c)(4) as a class action on behalf of the proposed Class and subclasses, as warranted; that the named Plaintiffs be appointed as Class Representatives; and that counsel below be designated Class Counsel;

213.    That an injunction be issued enjoining Defendants from the continuation of their "TAFT" scheme, and further, enjoining Defendants from continuing to violate the laws of the states and U.S. territories described herein.

214.    That an injunction be issued declaring that Plaintiffs' and Class Members have a right to rescind their contracts and that Defendants must disgorge profits received from Plaintiffs and Class Members.

215.    Judgment to be entered in favor of Plaintiffs and Class Members against all Defendants on all causes of action and damages suffered;

216.    Plaintiffs and Class Members be awarded the full, fair, and complete recovery for all causes of action and damages suffered;

217.    Plaintiffs and Class Members be awarded rescission, damages, punitive damages, restitution, attorney's fees, and costs.

218.    Plaintiffs and Class Members be awarded all appropriate costs, fees, expenses, and prejudgment and post-judgment interest, as authorized by law; and

219.    Such other relief that the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

Dated:  December 22, 2018

Respectfully submitted,

DICKINSON WRIGHT PLLC

By: /s/ Vijay G. Brijbasi
       Vijay G. Brijbasis, Florida Bar #15037
       350 East Las Olas Boulevard
       Suite 1750
       Ft. Lauderdale, FL  33301

Phone:  954-991-5420
Fax:  844-670-6009
VBrijbasi@dickinson-wright.com

*Attorneys for Plaintiffs and Putative Class*